UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHELLE WILLIAMS DRYDEN,

    Plaintiff,

    v.                                 Case No. 20-CV-402

KILOLO KIJAKAZI,
Acting Commissioner of Social Security[1],

    Defendant.

## DECISION AND ORDER

Michelle Williams Dryden seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her Title XVI application for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

On July 19, 2016, Dryden filed a Title XVI application for SSI alleging disability beginning on December 22, 2015 due to chronic pelvic pain, muscle spasm, psoas muscle[2] strain, depression, sleep disturbance, recurrent panic attacks, and anxiety. (Tr. 15, 20.) Dryden's application was denied initially and upon reconsideration. (Tr. 15.) Dryden filed a

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's recent appointment as acting commissioner.
[2] The psoas muscle is located in the lower lumbar region of the spine and extends through the pelvis to the femur. This muscle works by flexing the hip joint and lifting the upper leg towards the body. A common example of the movement created from this muscle is walking. *See* Psoas Syndrome, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15721-psoas-syndrome (last visited Sept. 15, 2021).

request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on August 23, 2018. (Tr. 33–71.) Dryden testified at the hearing, as did Steven Bosch, a vocational expert. (Tr. 15, 33.)

In a written decision issued April 23, 2019, the ALJ found that Dryden had the severe impairments of adenomyosis[3], depressive disorder, and post-traumatic stress disorder (PTSD). (Tr. 17.) The ALJ found that Dryden did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 18.) The ALJ further found that Dryden had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations: no climbing of ladders, ropes, or scaffolds; no exposure to unprotected heights or unprotected moving machinery; only occasional balancing, stooping, crouching, kneeling, crawling, or climbing of ramps and stairs; limited to understanding, carrying out, and remembering no more than simple instructions involving simple, routine tasks performed in an environment free from fast-paced production requirements; limited to work involving only simple work-related decisions and few if any workplace changes; and capable of occasional interaction with supervisors, coworkers, and the public. (Tr. 19–20.)

While Dryden has no past relevant work, the ALJ found that given her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (Tr. 26.) As such, the ALJ found that Dryden was not disabled since July 19, 2016, the date her application was filed. (Tr. 27.) The ALJ's decision became the

---

[3] Adenomyosis is a condition "that occurs when the tissue that normally lines the uterus (endometrial tissue) grows into the muscular wall of the uterus. The displaced tissue continues to act normally—thickening, breaking down and bleeding—during each menstrual cycle. An enlarged uterus and painful, heavy periods can result." *Adenomyosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/adenomyosis/symptoms-causes/syc-20369138 (last visited September 13, 2021).

Commissioner's final decision when the Appeals Council denied Dryden's request for review. (Tr. 1–6.)

## DISCUSSION

### *1.   Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

3

## 2. *Application to This Case*

Dryden argues that the ALJ erred by: (1) rejecting the opinion of consultative examiner Mark Pushkash, Ph.D. regarding her concentration, persistence, or pace limitations; (2) assigning little weight to the opinion of Dr. Itamar Gnatt, her treating physician; and (3) improperly interpreting and considering evidence related to her adenomyosis. I will address each argument in turn.

### 2.1 Evaluation of Consultative Examiner's Opinion

Dryden argues that the ALJ failed to provide a proper explanation for rejecting the opinion of Dr. Mark Pushkash regarding her ability to maintain concentration, persistence, or pace in a work setting. (Pl.'s Br. at 12–13, Docket # 20.) On May 23, 2017, Dryden underwent a consultative examination with Dr. Pushkash to evaluate her depression and anxiety. (Tr. 584–87.) Dr. Pushkash noted Dryden's complaints of chronic abdominal and pelvic pain, depression, and anxiety stemming from a February 2015 accident where she fell as her porch collapsed beneath her. (Tr. 584.) Dryden reported that after the accident, she could no longer sit or stand very long, no longer enjoyed socializing, spent her days "think[ing] about everything that happened," and dreamt of falling on the porch almost every night. (Tr. 585–86.)

On examination, Dr. Pushkash noted that Dryden was "able to pay attention" and displayed no signs of distractibility or other symptoms of ADHD; had a depressed affect and anxious mood; and was oriented to person, place, time, and circumstance. (Tr. 585–86.) Dr. Pushkash concluded that Dryden could comprehend, recall, and follow-through on instructions; would likely be moderately to severely impaired in her ability to concentrate and

4

persist on tasks at work due to the interfering effects of an anxiety disorder; and would be able to appropriately relate to supervisors and coworkers. (Tr. 586–87.)

The ALJ assigned partial weight to Dr. Pushkash's opinion. (Tr. 23.) Specifically, the ALJ found that Dr. Pushkash's diagnosis of depression was supported by the evidence, and the record further reflected a diagnosis of PTSD based on Dryden's reports of recurrent nightmares and anxiety due to her accident. (*Id.*) However, the ALJ found Dr. Pushkash's opinion that Dryden would be moderately to severely impaired in her ability to concentrate and persist at work due to anxiety was not supported by the medical evidence in the record. (*Id.*) The ALJ noted that Dryden served as the primary caregiver to her two young children and was able to maintain regular concentration and focus in performing her activities of daily living. (*Id.*) The ALJ further noted that Dryden was able to make and keep medical appointments without difficulty, and there was no indication in the record of difficulties with her ability to concentrate or comply with medical directives. (*Id.*) As such, the ALJ concluded that the record did not support more than moderate limitations in Dryden's ability to maintain concentration, persistence, or pace. (*Id.*)

As an initial matter, I note that the ALJ did not completely reject Dr. Pushkash's opinion regarding Dryden's concentration, persistence, or pace limitations. Rather, the ALJ rejected the specific conclusion that Dryden would likely be severely impaired in her ability to concentrate and persist at work due to her anxiety. Dryden argues that the ALJ erroneously rejected Dr. Pushkash's opinion based on her role as primary caregiver for her two young children and ability to perform various activities of daily living. (Pl.'s Br. at 13–15.) She asserts that the Seventh Circuit has cautioned against making broad assumptions about an individual's ability to work based on caring for family members; that the ALJ never asked her

about the extent of her childcare and ignored evidence demonstrating her limitations in performing household chores; and that the ALJ ignored the fact that Dr. Pushkash was "fully aware of [her] family situation" and the help she received from her children's father. (*Id.*) Similarly, Dryden challenges the ALJ's reliance on her ability to make and keep medical appointments. (*Id.* at 15.)

I agree that Dryden's ability to perform household chores, take care of her two young children, and make and keep medical appointments were insufficient reasons to discount Dr. Pushkash's opinion as to severe concentration and persistence limitations. As Dryden notes, the Seventh Circuit has explained that one "*must* take care of her children, or else abandon them to foster care or perhaps [other family], and the choice may impel her to heroic efforts." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (emphasis in original). Further, these activities are not indicative of an ability to concentrate and persist on tasks in a full-time work environment. Nevertheless, this error in and of itself does not require remand because the ALJ gave additional, sufficient reasons for finding that a severe limitation in concentration and persistence was not supported by the record. Specifically, the ALJ noted that there was no indication from the record that Dryden had any difficulties with concentration (Tr. 23) and noted at step three of the sequential evaluation process that while Dryden reported she could only maintain attention for approximately three minutes, the ALJ observed no difficulty with her ability to follow the hearing proceeding and supply timely and appropriate answers to the questions posed (Tr. 19). As such, the ALJ had sufficient evidence to conclude that Dryden would not be severely limited in her ability to concentrate and persist at work, and Dryden presents no evidence to the contrary.

6

Dryden additionally argues that Dr. Pushkash explicitly connected her concentration and persistence difficulties to her anxiety disorder, but the ALJ failed to acknowledge supporting evidence in the record related to her anxiety, including: Dr. Pushkash's observations of her anxiety at the examination; notes from her counselor, William Klemp, LCSW, documenting "severe difficulties" in maintaining concentration, persistence, or pace and intrusive thoughts; and medical records documenting anxiety. (Pl.'s Br. at 15.)

Dryden's attempt to bootstrap the opined concentration and persistence difficulties with records documenting anxiety is unpersuasive. None of the evidence that Dryden cites supports a finding of severe concentration and persistence limitations. While Dr. Pushkash noted that Dryden was anxious, he also observed that she was able to pay attention and had no signs of distractibility. (Tr. 585.) Further, the treatment records from Dryden's counselor, William Klemp, consist of checked boxes on mental health report forms with no indication that Klemp connected Dryden's anxiety to any concentration and persistence limitations. (Tr. 593, 597–98, 605–06.) And the treatment notes documenting anxiety that Dryden points to largely consist of her subjective reports and do not support a finding that she experienced severe difficulty concentrating and persisting due to anxiety.

Finally, Dryden argues that the ALJ erred by "fail[ing] to notice that Dr. Pushkash had evidence beyond his observations" at the consultative examination, namely medical records from her most recent hospitalization for suicidal ideation. (Pl.'s Br. at 16.) However, Dryden does not explain why the ALJ's omission of the fact that Dr. Pushkash considered this record evidence changes the outcome. As such, the ALJ's evaluation of Dr. Pushkash's opinion regarding Dryden's concentration, persistence, or pace limitations does not require remand.

### 2.2 Evaluation of Treating Provider's Opinion

Dryden argues that the ALJ failed to provide good reasons for rejecting the opinion of Dr. Itamar Gnatt, her treating physician. (Pl.'s Br. at 17.) An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. Generally, more weight is given to the medical opinions of treating sources.[4] 20 C.F.R. § 404.1527(c)(2). If the opinion of a treating source is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion is given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply reject it. SSR 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he must evaluate the opinion's weight by considering a variety of factors, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(c).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can

---

[4] On January 18, 2017, the SSA published the final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 FR 5844). The final rules became effective on March 27, 2017. For claims filed before March 27, 2017, however, the SSA continues to apply the prior rules that were in effect at the time of the ALJ's decision. https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last visited September 13, 2021).

reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The record contains several medical opinions from Dryden's treating providers that were given to Wisconsin Works ("W-2") regarding her work capacity. On January 16, 2017, Dr. Raheel Mods opined that Dryden was physically limited to lifting and carrying 10 pounds occasionally, but otherwise opined no further limitations. (Tr. 631–35.) In contrast, on July 28, 2017, Dr. Gnatt opined that Dryden could lift and carry no more than two pounds occasionally and no amount of weight frequently, could stand and walk no more than two hours in an eight-hour day and walk 500 feet without rest or severe pain, and could sit no more than two hours during an eight-hour day. (Tr. 626.) Dr. Gnatt further opined that Dryden's symptoms would occasionally interfere with her performance of simple work tasks; that her impairments would cause her to be absent from work more than three times per month; that she would require frequent positional changes; and that she had a low tolerance for frustration and difficulty maintaining her activities of daily living. (Tr. 627–28.) On January 22, 2018, nurse practitioner Jennifer Hartlaub opined that Dryden could do no lifting, walk no more than three city blocks without rest or experiencing pain, and sit no more than two hours during an eight-hour day. (Tr. 620.) And on January 17, 2019, Dr. Abdulrehman Siddiqui opined that Dryden had limited range of motion in her lower extremities. (Tr. 611.)

The ALJ, collectively considering these W-2 forms, assigned the opinions of Dryden's providers little weight because they were seemingly based substantially on her subjective reports and were "unsupported by any medical signs or findings consistent with the extreme limitations" offered therein. (Tr. 24.) Although the ALJ rejected all of these opinions, Dryden challenges the ALJ's rejection of Dr. Gnatt's opinion, arguing that the analysis consists of

9

only one sentence and fails to expound on how her subjective reports were unsupported by the record. (Pl.'s Br. at 18–20.) But Dryden points to no evidence in the record supporting such extreme limitations. In fact, one of her providers, contrary to Dr. Gnatt, opined that Dryden could lift ten pounds, which is consistent with sedentary work.

Dryden further argues that the ALJ mischaracterized Dr. Gnatt's opinion regarding her ability to lift and carry. (Pl.'s Br. at 17.) Specifically, she argues the ALJ incorrectly stated that Dr. Gnatt opined no lifting and carrying limitations and falsely claimed that Dr. Gnatt believed Dryden could carry over 100 pounds frequently. (*Id.*) As an initial matter, it is entirely unclear Dryden's basis for asserting that the ALJ believed that Dr. Gnatt opined that Dryden could carry well over 100 pounds frequently. (*See id.*) As the Commissioner correctly points out, this assertion appears nowhere in the ALJ's decision. (Def.'s Br. at 19, Docket # 23.) n summarizing Dr. Gnatt's opinion, however, the ALJ does misstate that Dr. Gnatt appeared to assess no limitations regarding Dryden's ability to lift and carry. (Tr. 24.) Clearly, as cited above, Dr. Gnatt opined that Dryden could lift two pounds occasionally and less than two pounds frequently. This error, however, does not require remand as the ALJ sufficiently explained why he rejected such restrictive lifting limitations.

As such, I find that the ALJ did not err in rejecting Dr. Gnatt's opinion.

### 2.3 Consideration of Adenomyosis

Finally, Dryden argues that the ALJ "played doctor" by interpreting the results of a July 2017 MRI that suggested the presence of focal adenomyosis. (Pl.'s Br. at 20.) Dryden argues that instead of determining the significance of the MRI, the ALJ should have assigned weight to the opinions of her treating providers who were aware of her adenomyosis or sought assistance from a medical expert. (*Id.* at 21.) She further argues that the ALJ erred by rejecting

her allegations of disabling symptoms based on her refusal to seek further evaluation or treatment without first inquiring about her reasons for declining such treatment. (*Id.* at 22.)

As stated above, Dryden began complaining of pelvic and abdominal pain after an accident in February 2015 where her porch collapsed as she walked up the stairs to her home. (Tr. 262–66.) She continued to report pain in the months thereafter (Tr. 297, 304) but reported in April 2015 that her pain was much improved (Tr. 311). However, she reported in May 2015 that she reinjured her pelvis after attempting to lift a nursing home resident at work (Tr. 318) and reported difficulty sitting down (Tr. 333).

In December 2015, Dryden reported that she had been experiencing a significant worsening of her pain with her menstrual cycle since May. (Tr. 348.) She stated that she had tried Tylenol, ibuprofen, and muscle relaxers without any improvement and rated her pain severity as 10/10. (*Id.*) A pelvic exam taken that month revealed mild left sided tenderness. (Tr. 359.) However, Dryden's provider noted that she was able to get on and off the exam table without or assistance or difficulty and could position herself in stirrups without assistance or bracing, and that her reports of pain severity of 8-9/10 were not congruent with her physical examination. (*Id.*)

In January 2016, Dryden treated with Dr. Keisha Rogers for a follow-up of her pelvic pain, rating it as a 10/10 in severity on most days. (Tr. 365.) Dr. Rogers noted that a December 2015 pelvic ultrasound demonstrated a slightly thickened endometrial stripe and fluid in the endometrial canal. (*Id.*) Dr. Rogers also noted that they had discussed the use of oral contraceptive pills to help with Dryden's pain and heavy bleeding during menstruation, and Dryden's statement that "she does not condone birth control and will not take it." (Tr. 365–66.) At an April 2016 appointment for menstrual issues and pelvic pain, Dr. Rogers noted

that Dryden's chronic pelvic pain was "likely multifactorial in nature" and that although they had discussed oral contraceptive pills in the past to help with her menstrual cycles, Dryden had not been interested and was not interested at that visit either. (Tr. 383.)

In June 2017, Dryden was referred to Dr. Andra Cicero for further evaluation of her menstrual pain and heavy bleeding. (Tr. 707.) Dr. Cicero noted that Dryden sought treatment in February 2013 for the same issues and was recommended hormonal regulation but "adamantly declined." (*Id.*) Dr. Cicero further noted that a pelvic ultrasound from March 2017 was possibly indicative of adenomyosis and while Dryden described excruciating pelvic pain during menstruation, she continually declined hormonal regulation. (Tr. 708.) Dr. Cicero ordered a pelvic MRI for further evaluation of possible adenomyosis and instructed Dryden to schedule an appointment. (Tr. 711.) In July 2017, Dr. Cicero noted that Dryden had not complied with instructions to obtain the pelvic MRI and adamantly declined to proceed with an endometrial biopsy. (Tr. 713.) After Dryden underwent the pelvic MRI, Dr. Cicero noted in August 2017 that the results suggested the presence of focal adenomyosis. (Tr. 714.) She further noted that after discussing the risks and benefits of the endometrial biopsy, Dryden again declined and stated that she would prefer to reschedule when she was more mentally prepared. (Tr. 714–15.) Dr. Cicero noted that Dryden was told to return to the office if she wanted to proceed with further evaluation and management of her adenomyosis, but she was unsure if Dryden would return. (Tr. 715.)

State agency medical consultants Dr. Rohini Mendonca and Dr. Lawrence Schaffzin opined in December 2016 and April 2017 respectively that Dryden had no severe physical impairments. (Tr. 77, 89.) The ALJ assigned their opinions little weight, noting that although an etiology for Dryden's ongoing complaints of pelvic pain were unclear, a July 2017 pelvic

MRI showed focal thickening of the uterine junctional zone suggesting the presence of focal adenomyosis. (Tr. 25.) The ALJ determined that given Dryden's long history of pelvic complaints, adenomyosis was a severe impairment. (*Id.*) However, the ALJ found that Dryden's adenomyosis was not disabling because she declined further evaluation or treatment contrary to medical recommendation, which the ALJ found to be inconsistent with her reports of disabling pain. (*Id.*) The ALJ also noted that Dryden's treating provider, Dr. Siddiqui, reported in July 2018 that her chronic pelvic complaints were of unknown etiology. (*Id.*) The ALJ concluded that, to accommodate Dryden's complaints of pain on exertion, a limitation of sedentary work with postural restrictions and no exposure to heights or unprotected moving machinery was appropriate. (*Id.*)

Thus, the ALJ discounted Dryden's allegations of disabling symptoms based on the fact that she declined further evaluation and treatment contrary to medical recommendation. (Tr. 25.) SSR 16-3p provides that before an ALJ can discount a claimant's symptoms based of the failure to follow treatment recommendations, the ALJ must consider possible reasons why the claimant did not comply with or seek treatment consistent with the degree of the claimant's complaints. The regulation further provides that the ALJ "will consider and address reasons for not pursuing treatment that are pertinent to an individual's case." SSR 16-3p. Various treatment notes in the record indicate that Dryden refused to try oral contraceptive pills to treat the symptoms of her adenomyosis. However, the ALJ did not explicitly confront this evidence or seek an explanation from Dryden at the hearing. This was error. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (noting that the ALJ must first explore a claimant's reasons for a lack of medical care before drawing a negative inference).

As such, this case will be remanded for further evaluation of Dryden's subjective symptoms in accordance with SSR 16-3p.

## CONCLUSION

Dryden asserts that the ALJ made various errors requiring reversal and remand of this case. I agree that the ALJ erred by failing to comply with SSR 16-3p before discounting Dryden's allegations of disabling symptoms from adenomyosis. As such, the Commissioner's decision is reversed and the case will be remanded for further proceedings consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of September, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge